# EXHIBIT A

**MOUTINY LIMITED**

(A United Arab Emirates limited company)

## OPERATING AGREEMENT

# MOUTINY LIMITED

## OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** (this "*Agreement*") dated this 12th day of April, 2006 (the "*Effective Date*"), is made by and between **Aramtel Limited,** a United Arab Emirates JAFZA offshore company ("*Aramtel*"), and **DynaCorp Limited ("*DynaCorp*"),** a United Arab Emirates JAFZA offshore company.

**WHEREAS,** the parties hereto have authorized the organization of **Moutiny Limited,** which was accomplished by the filing of a certificate of incorporation with the Registrar pursuant to JAFZA regulations, and

**WHEREAS,** the parties have organized Moutiny Limited to own 100% of the ownership interests in VitelTel, an Iraq public limited company ("*VitelTel*"), and

**WHEREAS,** the parties desire to set forth and agree upon the terms and conditions governing the operation of Moutiny Limited, and

**WHEREAS,** the parties agree to make appropriate revisions to this agreement necessary to conform to applicable law and to provide for reasonably prudent corporate and individual tax planning. Further, the parties agree to cooperate in good faith with legal counsel practicing in the United States, the UAE and/or the Republic of Iraq to accomplish any such revisions.

**NOW, THEREFORE,** in consideration of the premises and the mutual covenants set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE I
## GENERAL

Section 1.1.     <u>Name of Company; Organization</u>.  The name of the Company shall be "Moutiny Limited." The Company may do business under that name and such variations thereof and other names as the Managing Member deems appropriate.  The Members hereby acknowledge that they authorized the organization of the Company by directing the UAE resident agent, to: (i) execute a copy of the **Memorandum of Association,** a copy of which is attached hereto as **Exhibit 1,** and (ii) cause such executed copy to be filed with the JAFZA Registrar.  To the extent that the Company's Memorandum of Association contains provisions that conflict with the provisions of this Agreement, this Agreement shall control, and the parties agree to amend the Memorandum of Association to conform the same to the provisions of this Agreement.

Section 1.2.     <u>Principal Office and Resident Agent</u>.  The principal office address of the Company in Iraq shall be as the Managing Member may determine.  The name of the resident agent of the Company is First Offshore Management Consultancy, whose address is P.O. Box 30247, Dubai, UAE.

Section 1.3.     <u>Purposes of Company</u>.  The purposes for which the Company is formed and the business and objects to be carried on and promoted by it are:

(i)      to own 100% of the ownership interests in VitelTel, which shall be engaged in the business of providing Wireless Local Loop and other telecommunication services in the Republic of Iraq and

elsewhere; VitelTel's responsibilities shall include, but shall not be limited to, the installation, commissioning, and provisioning of all systems, operations and maintenance of all systems, and sales and marketing of Wireless Local Loop Services;

(ii)     to acquire, develop, exploit, sublicense, and otherwise deal in licenses, permits, and all manner of rights to provide wireless telecommunications services; and

(iii)     to engage in any one or more of businesses or transactions, or to acquire all or any portion of any entity engaged in any one or more businesses or transactions, as determined by a Majority of the Members and as is permissible under the **Act**, as amended from time to time.

The foregoing enumerated purposes and objects shall be in no way limited or restricted by reference to, or inference from, the terms of any other clause of this or any other Article of this Agreement, and each shall be regarded as independent, and they are intended to be and shall be construed as powers as well as purposes and objects to the Company and shall be in addition to and not in limitation of the general powers of limited companies under the laws of the United Arab Emirates.

The parties acknowledge and agree that the primary purpose and function of the Company is to serve as a "holding company" to own all of the ownership interests in VitelTel, and that VitelTel (and not the Company) shall conduct business operations to carry out the activities specified in clause (i), above. The parties further understand and agree that it will be necessary for them to consult with legal counsel in the United States, the Republic of Iraq and the United Arab Emirates to ensure that the arrangements described in this Agreement may lawfully be carried out, and enforced, and are in compliance with the laws of those Jurisdictions. The parties further understand and agree that certain changes to the arrangements described in this Agreement may be necessary to provide for reasonably prudent corporate and individual tax planning. To accomplish the purposes set forth in this paragraph, the parties agree to make appropriate modifications, amendments and revisions to this Agreement, and to any governing documents pertaining to the Company and/or to VitelTel in order to effectuate and carry out the arrangements reflected herein, and the intent of the parties reflected hereby.

Section 1.4.     Authority of the Company.  The Company shall have all the general powers granted to limited liability companies under the laws of the United Arab Emirates.

Section 1.5.     Title to Company Property.  All property owned by the Company shall be owned by the Company as an entity, and no Interest Holder, individually, shall have any ownership interest in such property.  The Company may hold any of its assets in its own name or in the name of its nominee, which nominee may be one or more individuals, corporations, limited liability companies, partnerships, trusts or other entities, including any Interest Holder.

Section 1.6.     Existence.  The existence of the Company shall be perpetual.

Section 1.7.     Accounting.  All amounts set forth in this Agreement and financial determinations are to be made in United States dollars.  The Company and VitelTel shall use a firm of certified independent public accountants selected by a Majority of the Members.

## ARTICLE II
## DEFINITIONS

Defined Terms.  As used herein, the following terms and phrases shall have the meanings indicated, unless the context otherwise requires:

"*__Accountants__*" means such firm of independent certified public accountants as determined by the Majority of the Members to be engaged from time to time for the Company and VitelTel.

"*__Act__*" means Jebel Ali Free Zone Authority Offshore Companies Regulations 2003, as amended from time to time.

"*__Affiliate__*" means: (i) any corporation, limited liability company, partnership, trust or other Person directly or indirectly controlling, controlled by or under common control with the Person to which this definition is applied and (ii) any officer, member, director, trustee or general partner of any Person described in (i) above.  For purpose of this definition, "controlling" or "controlled" shall mean owning, directly or indirectly, 50% or more of an entity's outstanding voting interests, capital interests or profits interests.

"*__Agreement__*" means this Operating Agreement as the same may be amended and in effect from time to time.

"*__Appraiser__*" means any Appraiser, selected in accordance with the terms of Article XIII of this Agreement.

"*__Appraised Value of the Company__*" means the fair market value of the Company and VitelTel, determined on a consolidated basis, as of the date of the event giving rise to a right or obligation to purchase an Interest Holder's Interest.

"*__Appraised Value of the Equipment__*" means the fair market value of the equipment of VitelTel as determined by the Majority of the Members in their reasonable discretion.  The fair market value of the equipment of VitelTel shall be comparable with telecommunications equipment manufactured in the United States of a similar price, performance, functionality and condition.

"*__Available Cash__*" means, for a taxable year, gross revenue of the Company and VitelTel, as determined on a consolidated basis, and funds previously set that are no longer needed for the maintenance of reasonable and prudent reserves, less the sum of the following payments and expenditures:

　　　　(i)　　　　all principal and interest payments on indebtedness of the Company and/or VitelTel, including debts owing to any Interest Holder (including satisfaction of the terms of the Promissory Note), payable during such taxable year, and all other sums paid to lenders;

　　　　(ii)　　　　all cash expenditures incurred incident to the normal operations of the Company's and VitelTel's business, including but not limited to any expenses described in Article VI hereof;

　　　　(iii)　　　　funds used for the purchase of equipment;

　　　　(iv)　　　　three percent (3%) of gross revenues paid to the consulting firm that has provided and will provide services to VitelTel with respect to the License; and

　　　　(v)　　　　the amount of any funds set aside for the establishment and maintenance of reasonable and prudent reserves.

"*__Bankruptcy__*" shall mean, with respect to any Interest Holder, the occurrence of any of the following events:

　　　　(i)　　　　an assignment for the benefit of creditors by the Interest Holder;

(ii)    the Interest Holder files a voluntary petition of bankruptcy under the U.S. Bankruptcy Code or the Bankruptcy Code (or other law analogous to a Bankruptcy Code) of any other Jurisdiction;

(iii)    the adjudication of an Interest Holder as bankrupt or insolvent or the entering against the Interest Holder an order for relief in any bankruptcy or insolvency proceeding;

(iv)    the filing of a petition or answer seeking for the Interest Holder any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law, regulation or declaration;

(v)    the consent or acquiescence by the Interest Holder of the appointment of a trustee for, receiver for, or liquidation of the Interest Holder or of all or any substantial part of the Interest Holder's properties;

(vi)    the filing by the Interest Holder of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Interest Holder in any proceeding described in subsections (i) through (v) above; or

(vii)    the commencement of any proceeding against the Interest Holder seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the laws of any Jurisdiction, which continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver or liquidator for the Interest Holder or all or any substantial part of the Interest Holder's properties without the Interest Holder's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated.

"***Book Value***" shall mean the amount determined, as of the date of an event giving rise to a right or obligation to purchase an Interest Holder's Interest, by subtracting the total liabilities of the Company and VitelTel (on a consolidated basis) from the total assets (excluding any valuation for goodwill) of the Company and VitelTel (on a consolidated basis) as stated in the consolidated balance sheet for the period ending the last day of the calendar year immediately preceding the event giving rise to the transfer. All computations and calculations required to be made hereunder shall be made by the Accountants for the Company, using (to the extent applicable in his/her/its sole discretion) United States generally accepted accounting principles, applied on a consistent basis. The Accountants' determination shall be final, conclusive, and binding upon all of the parties.

"***Capital Account***" means the account maintained by the Company for each Interest Holder in accordance with the following provisions:

(i)    each Interest Holder's Capital Account shall be increased by the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of profit, and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to applicable law; and

(ii)    each Interest Holder's Capital Account shall be decreased by the amount of money and the fair market value of any Company property distributed to the Interest Holder, the Interest Holder's allocable share of losses, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to applicable law.

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Interest.

"*__Capital Contribution__*" means the total amount of cash and the fair market value of any other assets of value contributed to the Company by an Interest Holder, net of liabilities assumed or to which such assets are subject, as capital in accordance with this Agreement. Any reference in this Agreement to the Capital Contribution of a current Interest Holder shall include any Capital Contribution previously made to the Company by any predecessor in interest to the current Interest Holder.

"*__Capital Proceeds__*" means the gross receipts received by the Company and/or VitelTel from a Capital Transaction.

"*__Capital Transaction__*" means any transaction not in the ordinary course of business which results in the receipt by the Company and/or VitelTel of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards and insurance proceeds.

"*__Company__*" means the limited liability company existing under the Articles of Organization, as amended from time to time.

"*__Dissolution__*" means, with respect to any Interest Holder, the occurrence of any of the following events:

        (i)      if the Interest Holder is acting as an Interest Holder by virtue of being a trustee of a trust, the termination of the trust;

        (ii)      if the Interest Holder is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

        (iii)      if the Interest Holder is a corporation or other similar entity, the dissolution of the corporation or entity or the revocation of its charter or applicable organizational instrument; or

        (iv)      if the Interest Holder is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"*__Equipment__*" means any wireless network infrastructure equipment purchased from TWS, subsystems including but not limited to Mobile Switching Center (MSC), Home Location Register (HLR), National Gateway, International Gateway, Short Message Service Center (SMSC), Prepaid System, Voicemail System, Base Station Subsystem including Base Station Manager (BSM), Base Station Controller (BSC), and Base Transceiver Station (BTS), Microwave Transmission Equipment, Ancillaries (power rectifier system, batteries, antennas, cabling).

"*__Indemnified Party__*" has the meaning set forth in Section 12.4 hereof.

"*__Interest__*" means an Interest Holder's share of the capital, profits, and losses of the Company and the right to receive distributions from the Company.

"***Interest Holder***" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member, or a successor in interest to another Interest Holder.

"***Involuntary Withdrawal***" means, with respect to any Member, the Bankruptcy or Dissolution of the Member.

"***Jurisdiction***" means any territory, province, commonwealth, state, country, republic, or other governmental body.

"***License***" means that certain WLL O&M Agreement by and between the Iraqi Telecommunications and Posts Company and VitelTel, dated November 27, 2005.

"***Majority of Members***" or "***Majority of the Members***" means those Members owning seventy-five (75%) of the Interests held by all Members.

"***Managing Member***" means Dr. Faisal Fadul, or his successor.

"***Member***" means each Person signing this Agreement as a Member, whose name, business address, and facsimile telephone number, if any, are set forth on **Schedule A** attached hereto, and any Person who subsequently is admitted as a Member of the Company.

"***Memorandum of Association***" means the Memorandum of Association attached hereto as **Exhibit 1**, which will be filed with the JAFZA Registrar on March 7, 2006, for the purpose of forming Moutiny Limited, and all amendments thereto and restatements thereof.

"***Notice***" has the meaning as set forth in Section 14.1.

"***Officers***" means the Person or Persons designated in, or in accordance with, Section 4.4 hereof to which the power to manage the day-to-day operations of the Company have been delegated by the Managing Member, and any Person appointed as an additional or successor Officer.

"***Percentage of Interests***" means, as to a Member, the percentage set forth after the Member's name on **Schedule A**, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"***Person***" means any natural person, corporation, limited liability company, partnership, joint venture, association, estate, trust or other business, governmental or legal entity.

"***Positive Capital Account***" means a Capital Account with a balance of greater than zero.

"***Promissory Note***" means the promissory note in the form of Exhibit 2 attached hereto evidencing the Loan.

"***Remaining Members***" shall mean those Members other than Selling Interest Holders pursuant to Section 8.6.

"***Selling Interest Holder***" shall have the meaning as set forth in Section 8.6 hereof.

"***Site/Subscriber Equipment***" means equipment utilized to support the Equipment or for use by the end subscriber, including but not limited to generators, towers, shelters, air conditioners, phone sets, etc. VitelTel shall be responsible for the purchase of Site/Subscriber Equipment.

"***Tax Matters Member***" means Dr. Faisal Fadul.

"***Transfer***" or "***transfer***" means any voluntary or involuntary act by which an Interest Holder makes, or attempts or purports to make, or suffers to occur, any gift, sale, mortgage, pledge, assignment, hypothecation, encumbrance or other disposition of any Interest owned by it. The term "transfer" includes any transfer which takes place upon the death of an Interest Holder, whether by Last Will and Testament, operation of law or otherwise, and also includes any purported transfer, assignment, sale or other disposition by assignment or operation of law, as a result of the appointment of a trustee in bankruptcy for any Interest Holder, under any judgment or order, as the result of the appointment of a receiver for any Interest Holder, or as a result of any assignment for the benefit of creditors.

"***TWS***" means TECORE Wireless Systems MEA FZ-LLC, a limited liability company.

## ARTICLE III
## CAPITAL

Section 3.1.    Initial Capital Contributions; Representations and Warranties. Each Member shall make the following Capital Contribution to the Company:

       (i)    Aramtel shall contribute Five Hundred Thousand Dollars ($500,000) in cash;

       (ii)    DynaCorp and/or Dr. Faisal Fadul ("***Dr. Fadul***") shall contribute 100% of all of the ownership interests in VitelTel.

Each Member's Percentage of Interest in the Company shall be as set forth opposite its name on such **Schedule A** attached hereto.

DynaCorp and Dr. Fadul, jointly and severally, make the following representations and warranties to Company and Aramtel:

       (i)    DynaCorp, Dr. Fadul and/or his relatives or his Affiliates own or control 100% of the ownership interests in VitelTel;

       (ii)    DynaCorp and/or Dr. Fadul have the full power, capacity and authority to enter into this Agreement and to consummate the transactions contemplated hereby, and the execution and performance of this Agreement by DynaCorp and Dr. Fadul, and the performance by them of their obligations hereunder, does not and will not violate any contract, obligation, law, rule, regulation or court order applicable to either of them;

       (iii)    Other than with respect to the License, prior to the date of this Agreement, VitelTel has not conducted or transacted business, nor has it entered into any contract or agreement with any third party;

       (iv)    No suit, action or claim is pending or threatened against VitelTel by any third party or governmental agency, nor is there any basis for any such claim; and

---

(v)     Other than as set forth in paragraph (iii) above, VitelTel has no debts, obligations, liabilities or commitments to any third party or any governmental agency, and VitelTel's only asset is the License.

Section 3.2.     No Other Capital Contributions.   No Member shall be required to make any contribution to the capital of the Company, except as expressly set forth in this Article III, and except as set forth in the Act, no Member shall be bound by, or be personally liable for, the expenses, liabilities or obligations of the Company.

Section 3.3.     No Interest Paid on Capital Contributions.   No Interest Holder shall be entitled to receive interest on its Capital Account or Capital Contribution.

Section 3.4.     Return of Capital Contributions.   Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.  No Interest Holder shall be entitled to withdraw any part of its Capital Account or Capital Contribution or to receive any distributions from the Company except as expressly provided in this Agreement.

Section 3.5.     No Right to Partition.   No Interest Holder shall have the right to require partition of the property of the Company or to compel any sale or appraisal of the Company assets or any sale of a deceased Interest Holder's interest in the Company's assets.

Section 3.6.     Form of Return of Capital.   If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but cash in return of the Interest Holder's Capital Contribution.

Section 3.7.     Capital Accounts.   A separate Capital Account shall be maintained for each Interest Holder.

Section 3.8.     Loans.

(i)     Any Interest Holder may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Company and the Interest Holder agree.

(ii)     Upon the execution of this Agreement and from time to time thereafter (a) Aramtel shall advance to the Company and/or to VitelTel up to an amount not to exceed Twenty-Five Million Dollars ($25,000,000) to be used exclusively by the Company and/or VitelTel to fund the purchase of telecommunications equipment from TECORE Wireless Systems MEA FZ-LLC ("*TWS*") (the proceeds of any such loan shall be paid directly by Aramtel to TWS on behalf of the Company and/or VitelTel (the "***Equipment Funds***"); and (b) Five Million Dollars ($5,000,000) to be used for operating expenses determined in accordance with this Agreement (the "***Operating Funds***") (the Equipment Funds and the Operating Funds are collectively referred to herein as the "***Loan***").  The Loan shall be sufficient to fund VitelTel for six months to build a telecommunications system sized for 200,000 subscribers based on the business plan developed by VitelTel.

(iii)     The Company and VitelTel, both as primary obligors, shall execute and deliver to Aramtel (a) a Promissory Note in the form of **Exhibit 2** attached hereto evidencing the Loan; and (b) a Security Agreement in the form of **Exhibit 3** attached hereto granting Aramtel a security interest in the License and any and all other licenses, permits, and all manner of rights of VitelTel to provide wireless telecommunications services in Republic of Iraq.  Such Security Agreement shall specify that Aramtel's security interest terminates upon satisfaction of the Promissory Note.

(iv)    The amount of Equipment Funds to be loaned by Aramtel to the Company and/or VitelTel under Section 3.8(ii)(a), shall be determined as follows:

(a)    the Managing Member shall prepare a report detailing the equipment needed for the initial operations of the Company for approval by the Majority of the Members in their reasonable discretion.

(b)    after the Majority of the Members approves the report, the Appraised Value of the Equipment in such report shall be included in the Promissory Note.

Section 3.9.    Equipment Purchase Agreement.  The Company shall enter into, and cause VitelTel to enter into, an exclusive Equipment Purchase Agreement with TWS, for the purchase of Equipment deemed commercially suitable to carry on Business of VitelTel.  Such Equipment Purchase Agreement shall terminate on November 30, 2013.  All Members acknowledge and understand that Jay Salkini and/or members of his family own(s) controlling interests in TWS and Aramtel.  If any of the Equipment subsystems are deemed not to be commercially suitable for the Business of VitelTel, TWS shall have the obligation to repair or replace such subsystems.

Business of VitelTel shall mean the provision of cellular voice, data, SMS and prepaid services in the Republic of Iraq pursuant to the following performance parameters:

(a)    An access network which has a capability of data transfer;

(b)    An access network designed to meet 0.08 Erlang traffic and 1% blocking probability in switching and 5% blocking probability in air interface.

Section 3.10.    Additional Licenses.  From the Effective Date of this Agreement until November 30, 2013, TeckTel, Ltd., an Iraq public limited company, DynaCorp, and Dr. Fadul, and any Affiliate of DynaCorp, Dr. Fadul or TeckTel, Ltd., upon award of any and all other licenses to provide wireless telecommunications services in Iraq shall enter into an exclusive Equipment Purchase Agreement with TWS, for the purchase of equipment deemed commercially suitable if and only if an agreement is reached with TWS to jointly implement the project associated with said license and required funding has been obtained.  In the event an agreement is not reached with TWS to jointly implement the project or required funding has not been obtained, then the said license shall be sold or terminated by TeckTel, DynaCorp or Dr. Fadul or any of their Affiliates without any further obligation to TWS.  Any and all such Equipment Purchase Agreements shall terminate on November 30, 2013.

**ARTICLE IV**
**MANAGEMENT**

Section 4.1.    No Management Power.  No Member solely by virtue of being a Member may take part in the management, conduct or control of the business of the Company or have any right or authority to act for or bind the Company as a Member, except as otherwise provided in this Agreement.

Section 4.2.    Management by Managing Member.  Powers of the Managing Member.  The day to day management of the Company and of VitelTel shall be vested in the Managing Member.  Except as otherwise provided in this Agreement, the Managing Member shall have the power to make all decisions affecting day to day Company and/or VitelTel business and affairs, to hire and fire employees of the Company and/or VitelTel, checking and other necessary accounts, to negotiate and enter into contracts for debt on behalf of the Company and/or VitelTel, and to do any and all other things which the Managing Member deems necessary or desirable in connection with the conduct of the business and affairs of the

Company and/or VitelTel. The Managing Member shall exercise his best efforts on behalf of the Company and VitelTel and shall at all times seek to enhance and promote the business interests of the Company with VitelTel. Notwithstanding anything else in this Agreement, the Managing Member shall have the sole and absolute discretion to take the following actions:

(i)     to determine the amount of funds in excess of regularly scheduled payments that shall be made for principal and interest payments on indebtedness of the Company and/or VitelTel, including debts owing to any Interest Holder (including satisfaction of the terms of the Promissory Note), payable during such taxable year, and all other sums paid to lenders;

(ii)    other than the equipment purchased pursuant to the Promissory Note, to determine the amount of funds used for the purchase of any and all additional equipment (the necessity of such additional equipment to be in the Managing Member's reasonable discretion);

(iii)   all cash expenditures incurred incident to the normal operations of the Company's and VitelTel's business, including but not limited to any expenses described in Article VI hereof, provided however other than as set forth in (i) and (ii) above, and in Section 4.3(i) and (ii), below, purchases in excess of Fifty Thousand Dollars ($50,000) shall require the consent from the Majority of Members; and

(iv)    the amount of any funds set aside for the establishment and maintenance of reasonable and prudent reserves.

Section 4.3.   Restrictions on Authority.  With respect to the Company and its property, and VitelTel and its property, the Managing Member shall have no authority to perform any act in violation of the Act or any other applicable laws or regulations thereunder, nor shall the Managing Member have any authority, except with the consent of the Majority of Members, to:

(i)     prior to the satisfaction of the Promissory Note, other than as set forth in Section 4.2(i) and (ii) above enter into any contract or obligation on behalf of the Company or VitelTel in excess of fifty thousand dollars ($50,000);

(ii)    after the satisfaction of the Promissory Note, other than as set forth in Section 4.2(i) and (ii) above, enter into any contract or obligation on behalf of the Company or VitelTel involving amounts in excess of an amount equal to 200% of the Earnings of VitelTel for its most recent fiscal year. (The term "Earnings" shall mean the earnings of VitelTel, determined in accordance with United States generally accepted accounting principles, but excluding the proceeds of capital transactions and other extraordinary transactions).

(iii)   do any act in contravention of this Agreement;

(iv)    cause the Company and/or VitelTel to merge or consolidate the Company and/or VitelTel with another Person or entity, or sell all or a substantial part of the Company's or VitelTel's assets to another Person or entity;

(v)     admit any Person as a Member of the Company or permit or cause VitelTel to issue any ownership interest to any Person;

(vi)    do any act which would make it impossible to carry on the ordinary business of the Company and/or VitelTel;

(vii)     cause the Company and/or VitelTel to issue any new Interests, options, warrants, or other securities of any nature, kind, class or description; or

(viii)    cause the Company and/or VitelTel to enter into, terminate, modify, amend, sublicense, transfer, or otherwise dispose or deal with the License or any other license pertaining to the business of the Company and/or the business of VitelTel.

Section 4.4.     Officers.

(i)      The Managing Member shall serve as the Chief Executive Officer of the Company and of VitelTel for at least two (2) years from the date of this Agreement. The Managing Member may, in his sole discretion, delegate duties and powers to one or more officers or agents appointed by the Managing Member. Such officers may include a President, one or more Vice Presidents, a Secretary, a Treasurer and/or such other additional and assistant officers as the Managing Member may determine. The officers of the Company and VitelTel shall hold office for such period as the Managing Member may determine and have such duties as designated by the Managing Member.

(ii)     Officers, who are not Members, may be removed at any time by the Managing Member, but removal shall be without prejudice to the contractual rights, if any, of the person so removed. Election or appointment of an officer or agent shall not of itself create contractual rights. The Managing Member's right to remove officers shall not apply to the Chief Financial Officer of the Company or of VitelTel. A Chief Financial Officer of the Company and of VitelTel shall be appointed by the Majority of the Members and may be removed by the Majority of the Members.

(iv)     Any officer or agent may resign his office at any time by delivering written resignation to the Managing Member. Unless otherwise specified therein, such resignation shall take effect upon delivery.

Section 4.5.     Board of Directors. The Members, by a vote of the Majority of the Members, may elect to establish a Board of Directors to oversee the operations of the Company and/or of VitelTel. If so established, the powers of such Board of Directors will be determined by the Majority of the Members and set forth in an addendum to this Agreement.

Section 4.6.     Non-Compete Restrictions. The Managing Member, Dr. Fadul, DynaCorp and TeckTel, Ltd.. and any Affiliate of the foregoing (i) may not engage in any other wireless telecommunication business activities in the Republic of Iraq that are competitive with the wireless telecommunications business of VitelTel; and (ii) shall have the obligation to present to the Company and VitelTel any particular business opportunity relating in any manner to the wireless telecommunication business of VitelTel in the Republic of Iraq, even if such opportunity is one which could not be advantageous to the Company or VitelTel. This restriction shall expire on November 30, 2013.

**ARTICLE V**
**MEETINGS OF MEMBERS**

Section 5.1.     Place of Meetings. All meetings of the Members shall be held at an office in the United States of America as shall be determined by the Managing Member and agreed upon by the Members. The Members may conduct any meeting by telephone conference or other similar communications equipment if all persons participating in the meeting can hear and speak to each other at the same time. Participation in a meeting by such means shall constitute presence in person at such meeting.

Section 5.2.    Meetings.  Meetings of the Members may be called by the Members representing at least one-third of the Percentages of Interests.

Section 5.3.    Notice of Meetings.  Notice stating the time and place of the meeting shall be delivered not less than five (5) days nor more than thirty (30) days before the date thereof, by the person calling the meeting, to each Member.  Notice of the meeting need not specifically state the business to be transacted thereat.  Participation at any meeting, in person or by teleconference where all Members may hear and speak to each other at the same time or by proxy, shall constitute a waiver of the notice requirements contained in this Section 5.3.

Section 5.4.    Quorum.  The presence, at any meeting of the Members, in person or by teleconference where all Members may hear and speak to each other at the same time or by proxy, of a Majority of Members, constitutes a quorum for the transaction of business at any meeting of the Members.  Unless otherwise provided herein, all actions of the Members will be taken by Majority of Members.

Section 5.5.    Written Consents.  In lieu of holding meetings, the Members may vote or take action by a written consent of the Members; *provided, however*, that sufficient votes must be represented by such written consents adequate to meet or exceed the voting threshold for a particular action (e.g., a majority or unanimous vote, as the case may be).

Section 5.6.    Proxies - Members.  A Member may vote at a meeting of the Members in person or by proxy executed in writing by such Member or by its duly authorized attorney-in-fact.  Such proxy shall be filed with the Company before or at the time of such meeting of the Members.

**ARTICLE VI**
**FEES, REIMBURSEMENTS AND EXPENSES**

Section 6.1.    Expenses Generally.  The Managing Member shall cause the Company's expenses to be billed directly to and paid by the Company.  The Company shall reimburse the Members or Affiliates of the Members, for expenses of the Company advanced or paid by them, whether prior to or after formation of the Company.

Section 6.2.    Certain Company Expenses.  The Company shall pay all expenses of the Company, including all expenses incurred in connection with the business of the Company, which may include, but are not limited to:

(i)      costs of personnel employed by the Company;

(ii)     taxes and assessments on Company property and other taxes applicable to the Company;

(iii)    management, franchise, legal, appraisal, audit, accounting, brokerage and other fees;

(iv)     cost of supplies, services, equipment, travel, promotion and insurance as required in connection with the business of the Company;

(v)      expenses of organizing, revising, amending, converting, modifying or terminating the Company or this Agreement; and

(vi)     expenses of the Tax Matters Member or any management fee due to any Member in connection with its performance of any duties in that capacity.

Section 6.3.    Priority of Fees and Expenses.  Prior to the making of any distributions to Interest Holders pursuant to Article VII or otherwise pursuant to this Agreement, the Company shall make, or provide a reserve for, payment of all fees and expenses described in this Article VI.

## ARTICLE VII
### DISTRIBUTIONS

Section 7.1.    Distribution from Available Cash.  For each taxable year of the Company, unless the Majority of Members determine otherwise, Available Cash shall be distributed to the Interest Holders in accordance with their respective Percentages of Interests within ninety (90) days of the end of the taxable year.  Any other provision of this Agreement to the contrary notwithstanding, in the event that any Member (or owner of a Member) is subject to any tax by reason of the revenues or income attributable to operations of the Company and/or operations of VitelTel, then, unless the Majority of Members determine otherwise, distributions shall be made to the Members, proportionately, so that the obligation(s) of all such Members and/or owners may be satisfied by such distributions.

Section 7.2.    Distribution of Capital Proceeds from Capital Transactions.  Capital Proceeds shall be applied by the Company and distributed to the Interest Holders in the following order and priority:

      (i)    first, to the payment of all expenses of the Company incident to the Capital Transaction; then

      (ii)    to the establishment of any reserves that the Board of Directors deems necessary and prudent to satisfy liabilities or obligations of the Company; then

      (iii)    to the outstanding balance of the Loan; and then

      (iv)    the balance shall be distributed to the Interest Holders in accordance with their respective Percentages of Interests.

Section 7.3.    Distributions in Liquidation.  The proceeds arising from the winding up of the business and affairs of the Company as provided in Article X shall be used first to pay all of the Company's debts, liabilities and obligations to creditors, including debts owing to Interest Holders, and all expenses incurred in connection with the dissolution, winding up and termination of the Company and distribution of its assets as herein provided.  The amount remaining shall be distributed to the Interest Holders in accordance with the Positive Capital Account balances of the Interest Holders, as determined after taking into account all Capital Account adjustments (other than the adjustment required as a result of the distribution of such balance) for the Company's taxable year or years during which such winding up occurs.  No Interest Holder shall be obligated to restore a negative capital account.

Section 7.4.    Reserves in Liquidation.  A Majority of the Members may require the Managing Member to establish a reserve for contingencies related to liquidation or expend for any Company purpose any amounts received from the winding up the Company's business and affairs that they reasonably necessary or appropriate for the orderly winding up of the Company, including contingent liabilities or obligations of the Company.  The amount of such reserve shall be distributed in accordance with Section 7.3 hereof at such time as a Majority of the Members shall deem that any such reserve is no longer required or appropriate.

Section 7.5.     Accountants to Make Determinations.  Except with respect to matters as to which the Members or the Managing Member are granted discretion hereunder, the opinion of the Accountants shall be final and binding with respect to all disputes as to computations and related determinations required to be made under this Article VII.

Section 7.6.     Timing.  Except as otherwise provided in this Agreement, the timing of all distributions pursuant to this Article VII shall be determined by a Majority of the Members.

Section 7.7.     Restrictions on Distributions.  It is understood and agreed that all distributions are subject to the payment of the Company's expenses (including payment and satisfaction of the terms of the Promissory Note and the purchase of equipment) and that the Company may restrict or suspend distributions in circumstances in which a Majority of the Members determines that such action is in the best interests of the Company.

## ARTICLE VIII
### TRANSFER OF INTERESTS, PURCHASE OPTION AND WITHDRAWAL

Section 8.1.     Limitations on Transfers.

(i)     Except as provided in this Article VIII or elsewhere in this Agreement, no Member may sell, Transfer, pledge, hypothecate, give or otherwise dispose of or encumber all or any portion of its Interests without the prior written consent of a Majority of the Members, which consent may be given or withheld for any reason or no reason.  Each Interest Holder agrees that he/she/it will not transfer, or permit the transfer of, any Interest owned by him/her/it, other than in accordance with the terms and conditions of this Agreement.  Each Interest Holder further agrees that this Agreement shall apply to any Interest issued to, or acquired by, an Interest Holder subsequent to the date hereof.

(ii)     Any permitted assignee of an Interest shall be subject to all of the restrictions on the transferability of such Interest contained herein, and any assignee of an Interest shall have the rights of an Interest Holder, and not a Member, unless such assignee becomes a substitute Member pursuant to Section 8.2 hereof.

(iii)     No sale, Transfer, assignment, pledge or other disposition of all or any part of an Interest (whether voluntary, involuntary or by operation of law) may be made unless all of the following conditions have been satisfied or waived by the non-transferring Members:

(a)     the sale, assignment, pledge or other disposition is not in contravention of any of the provisions of this Article VIII;

(b)     a duly executed and acknowledged written instrument of assignment shall have been filed with the Company, which instrument shall specify the Interest, or portion thereof, being assigned and, in the case of the admission of a substitute Member, set forth the intention of the assignor that the assignee succeed to assignor's Interest as a substitute Member in his/her/its place;

(c)     the assignor and assignee shall have executed and acknowledged such other instruments as the Managing Member may deem necessary or desirable to effect such substitution; and

(d)     the assignor and assignee shall have executed written acceptance and adoption of the provisions of this Agreement.

(iv)    Any assignment, sale, exchange or other Transfer in contravention of any of the provisions of this Article VIII shall be void and ineffectual, and shall not bind or be recognized by the Company.

Section 8.2.    Right to Transfer Interests.

(i)    Prior to the satisfaction of the terms of the Promissory Note, neither Aramtel or DynaCorp may sale, Transfer, assign, pledge or otherwise dispose any of its respective Interests in the Company.

(ii)    Following satisfaction of the terms of the Promissory Note, DynaCorp may transfer certain portions of its Interests in the Company in accordance with the schedule set forth in Section 8.9 of this Agreement.

(iii)    Following satisfaction of the terms of the Promissory Note, Aramtel may transfer up to twenty percent (20%) of its Interests in the Company.

Section 8.3.    Power of a Member to Grant the Right to Become a Member to an Assignee of the Member's Interest.  No Member shall have the power to grant to an assignee or transferee of any part of its Interest the right to become a Member of the Company.  The Members may, however, in their absolute discretion, unanimously consent, in writing, to the admission of an assignee or transferee of the Interest of a Member as a substitute Member.  Upon the granting of such consent, the Managing Member shall file for recordation any documents or certificates which are required by applicable law to reflect any assignment made under this Section 8.2 where the assignee is to become a Member.  In no event shall an assignee become a substitute Member in place of his/her/its assignor unless all of the conditions set forth in Section 8.1(iii) are first satisfied or waived.

Section 8.4.    Payment of Costs and Expenses.  All costs and expenses incurred by the Company in connection with the assignment of an Interest and/or the substitution of an assignee as a substitute Member, including any filing fees, publishing costs and the fees and disbursements of counsel, shall be pre-paid by the assigning Interest Holder, or if not paid by such Interest Holder, then by the assignee.

Section 8.5.    Substitute Members Bound.  Each Person who becomes a Member in the Company by becoming a substitute Member shall and does hereby agree to be bound by the provisions of this Agreement and does hereby ratify and agree to be bound by all prior actions taken by the Company.

Section 8.6.    Withdrawals.

(i)    Voluntary Withdrawal.  No Member shall have the right or power to voluntarily withdraw from the Company without the written consent of a Majority of the Members.

(ii)    Involuntary Withdrawal.  Upon the occurrence of a Member's Involuntary Withdrawal, subject to the provisions of Section 8.6 hereinbelow, the successor to such Member's Interest shall succeed to such Member's right to receive all of the profits, losses, and distributions with respect to such Interest, but shall not become a substitute Member unless the provisions of Section 8.2 hereof are satisfied.

Section 8.7.    Transfer upon Bankruptcy or Dissolution.

(i)    In the event of the Bankruptcy or Dissolution of an Interest Holder ("***Selling Interest Holder***"), the Company, by a unanimous vote of the Members shall have the right, exercisable

within ninety (90) days after the date of the Interest Holder's Bankruptcy or Dissolution, by providing Notice to the remaining member (the "***Remaining Member***") of its intent to purchase all of the Selling Interest Holder's Interest.  In the event the Company elects to purchase the Selling Interest Holder's Interest, the closing of this transaction shall be held within ninety (90) days from the date of the Company's Notice.

(ii)   In the event that the Company does not elect to purchase the Selling Interest Holder's Interest, then the Remaining Member shall have the right, exercisable within one hundred twenty (120) days after the Selling Interest Holder's Bankruptcy or Dissolution, by providing Notice to the Company and to the Selling Interest Holder, to purchase the entire Selling Interest Holder's Interest. In the event that the Remaining Member elects to purchase the Selling Interest Holder's Interest, the closing of this transaction shall be held within ninety (90) days from the date of the Remaining Member's Notice.

(iii)   The Purchase Price shall be an amount equal to the Book Value multiplied by the Percentages of Interest to be purchased by the Company and/or the Remaining Member pursuant to Sections 8.7(i) and 8.7(ii).  Payment of the Purchase Price shall be made as follows:  (1) by a cash payment on the date of closing in an amount equal to ten percent (10%) of the Purchase Price, and (2) by the delivery of a promissory note, in the form attached hereto as **Exhibit 5**, for the unpaid balance.

Section 8.8.   Transfer of Interest upon Equipment Purchase.

(i)   Notwithstanding any other provision in this Agreement or in the Act and following satisfaction of all of the financial obligations under the Promissory Note, twenty five (25%) of the Interests owned by Aramtel shall be subject to purchase by DynaCorp from Aramtel upon the purchase of equipment from TWS and the payment of the purchase price therefor, according to the following provisions:

A.   Once the Cumulative Equipment Purchase Amount exceeds Fifty Million Dollars ($50,000,000), DynaCorp shall be entitled to purchase from Aramtel a one percent (1%) Interest for each Ten Million Dollars ($10,000,000) of Cumulative Equipment Purchase Amount until the total Cumulative Equipment Purchase Amount is One Hundred Million Dollars ($100,000,000), so that DynaCorp will, if the entire option is exercised, then own 60% of the Interests in the Company.

B.   Once the Cumulative Equipment Purchase Amount exceeds $100,000,000, then for each additional ten million dollars ($10,000,000) in Cumulative Equipment Purchase Amount up to $200,000,000, DynaCorp shall have the right and option to purchase an additional 1.5% Interest, so that, after the Cumulative Equipment Purchase Amount has reached $200,000,000, DynaCorp will, if the entire option is exercised under Paragraph A and the entire option is exercised under this Paragraph B, then own 75% of the Interests in the Company.

C.   The purchase price for each 1% Interest shall be an amount equal to ten thousand dollars ($10,000), payable in cash at closing.

D.   In order to exercise any option hereunder, DynaCorp shall provide written notice to Aramtel and to the Company, specifying the Interest it desires to purchase, and establishing a date for closing for his purchase.  At closing, Aramtel shall sell, and DynaCorp shall purchase, the appropriate Percentage Interest by executing an Assignment of Interest, in such form as shall be determined by legal counsel for the Company, and DynaCorp shall pay to Aramtel, in cash or in immediately available funds, the purchase price therefore unless otherwise agreed to in writing.

(ii)   The Cumulative Equipment Purchase Amount set forth in Section 8.8(i) above shall be determined on an annual basis by the aggregate total dollar amount associated with purchase orders

received by TWS for wireless telecommunications equipment to be used in the Republic of Iraq from (a) any individual, corporation, limited liability company, partnership, trust or other Person or corporate entity and (b) any officer, member, director, trustee or general partner of any Person described in (a) above introduced to TWS ("***Introduced Customer***") by the Company, the Managing Member, VitelTel, TeckTel, Inc., and any Affiliate of the foregoing and confirmed in writing by TWS as an Introduced Customer. At the end of each calendar quarter, TWS shall provide the Company a summary showing the transactions and corresponding amounts of equipment purchases from the Company and Introduced Customers during such calendar quarter which contribute to the Cumulative Equipment Purchase Amount.

      (iii)     After DynaCorp's exercise of the rights set forth in Sections 8.8(i)-(ii), DynaCorp shall own seventy five (75%) of the total Interests of the Company, and Aramtel shall own twenty five (25%) of the total Interests of the Company. After those purchases have been completed, DynaCorp shall have the right to purchase up to five percent (5%) of the remaining twenty five percent (25%) of the total Interests in the Company owned by Aramtel and such purchase shall be equal to Appraised Value of the Company multiplied by the Percentage of Interest to be purchased. Such purchase price shall be paid in cash at closing.

Section 8.9.     <u>Transfer of Interest upon Discretion of DynaCorp.</u>

      (i)     Notwithstanding anything else set forth in this Agreement, and provided the conditions set forth in this Section 8.9 are satisfied by either VitelTel or its Affiliates, as applicable, DynaCorp may transfer its Interests in the Company without restriction according to the following schedule:

      (a)     following satisfaction of the obligations of the Promissory Note, DynaCorp may transfer up to ten percent (10%) of its total Interests in the Company.

      (b)     after the Cumulative Equipment Purchase Amount exceeds $50,000,000, DynaCorp may transfer an additional ten percent (10%) of its total Interests in the Company.

      (c)     after the Cumulative Equipment Purchase Amount exceeds $100,000,000, DynaCorp may transfer an additional ten percent (10%) of its total Interests in the Company.

      (d)     after the Cumulative Equipment Purchase Amount exceeds $150,000,000, DynaCorp may transfer an additional seven and one half percent (7.5%) of its total Interests in the Company.

      (e)     after the Cumulative Equipment Purchase Amount exceeds $200,000,000, DynaCorp may transfer an additional seven and one half percent (7.5%) of its total Interests in the Company.

      (ii)     During its exercise of the option to transfer its Interests as set forth in Section 8.9 above and until the Cumulative Equipment Purchase Amount exceeds $200,000,000, DynaCorp shall be required at all times to maintain a Total Percentage Interest in the Company of at least thirty percent (30%).

      (iii)     Once the Cumulative Equipment Purchase amount exceeds $200,000,000, DynaCorp shall be allowed to transfer its remaining Interests in the Company without any further restriction.

Section 8.10.     <u>Ownership of DynaCorp.</u> Dr. Fadul represents and warrants that he owns 100% of the ownership interests in DynaCorp, and that he will not transfer any interest in DynaCorp, or allow any interest to be issued or transferred, until the Cumulative Equipment Purchase Amount exceeds $200,000,000, at which time he shall be allowed to transfer all or any portion of his interest in DynaCorp.

## ARTICLE IX
## DISSOLUTION, WINDING UP AND TERMINATION OF COMPANY

Section 9.1.     Dissolution by Members.   The Company may be dissolved by the unanimous written agreement of the Members.

Section 9.2.     Procedure for Winding Up.  If the Company is dissolved, the remaining Members shall wind up its business and affairs; if there are no remaining Members, the last Person to be a Member shall wind up its business and affairs; if there are neither remaining Members, or a Person who last was a Member, the legal or personal representatives of the Person who last was a Member shall wind up the business and affairs of the Company (collectively referred to as the *"Responsible Party"*).  In winding up the business and affairs of the Company, all assets of the Company shall be sold, liquidated and converted to cash or cash equivalents as promptly as is consistent with obtaining the fair value thereof.  Proceeds from the winding up of the business and affairs of the Company shall be distributed in accordance with Section 7.3 hereof.

Section 9.3.     Termination.  The Responsible Party shall terminate the Company following dissolution by filing **Articles of Cancellation** with the JAFZA Registrar.

## ARTICLE X
## BOOKS, RECORDS, AND ACCOUNTING

Section 10.1.     Books, Records and Accounting.  Adequate minute books and accounting records of all Company actions and business shall be maintained at the principal office of the Company and shall be open to inspection by any of the Members and their authorized representatives at all reasonable times upon reasonable notice.  The Company shall report for income tax purposes on the cash method or accrual method of accounting, as determined by the Majority of the Members.  Within seventy-five (75) days after the end of each taxable year and at the expense of the Company, the Managing Member shall cause to be prepared and sent to each Member financial statements for the preceding taxable year prepared by the Company in the ordinary course of its business, together with such appropriate information for purposes of preparing such Member's income tax returns for such taxable year.

Section 10.2.     Bank Accounts.  All funds of the Company shall be deposited in a bank account or accounts opened in the Company's name.  The Majority of Members shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

## ARTICLE XI
## AMENDMENT OF AGREEMENT

Section 11.1.     Amendment.  This Agreement may be amended by the Managing Member, without the consent or approval of any Member, if in the opinion of the Company's attorneys the amendment is necessary or appropriate to satisfy the requirements of applicable law with respect to the Company and the amendment does not adversely affect the interests of the Members.  At the option of the Managing Member, any amendment made pursuant to this Section 11.1, to the extent possible, may be made effective as of the date of this Agreement.

Section 11.2.     Amendment Requiring Consent of Members.  Any amendments to this Agreement, except an amendment permitted by Section 11.1 hereof, may be made only with the consent of the Majority of the Members.

Section 11.3.   Amendments in Writing.  Any amendment made pursuant to this Article XI must be in writing.

## ARTICLE XII
## COMPETITIVE ACTIVITIES, LIMITATION ON LIABILITY AND INDEMNIFICATION

Section 12.1.   Competition.  Except as set forth in Section 4.6: (i) any Member (and any Affiliate of any Member) may engage in any other business activities, including those that may be competitive with the business of the Company; and (ii) no Member shall have the obligation to present any particular business opportunity to the Company even if such opportunity is one which could be advantageous to the Company.

Section 12.2.   Limitation of Liability – Interest Holders.  No Interest Holder shall be liable, responsible or accountable in damages or otherwise to the Company or any Interest Holder for any action or omission by the Interest Holder on behalf of or with respect to the Company that is within the scope of the authority conferred on the Interest Holder by this Agreement or by law, unless such action was taken, or such omission was made criminally, fraudulently or in bad faith, or unless such action or omission constituted gross negligence or an intentional breach of this Agreement.

Section 12.3.   Limitation on Liability – Managing Members.  The Managing Member shall not be liable, responsible or accountable in damages or otherwise to the Company or any Interest Holder for any action or omission by such Managing Member on behalf of or with respect to the Company that is within the scope of the authority conferred on such Managing Member by this Agreement or by law, unless such action was taken, or such omission was made criminally, fraudulently or in bad faith, or unless such action or omission constituted gross negligence or an intentional breach of this Agreement.

Section 12.4.   Indemnification.  The Company shall indemnify each Member, the Managing Member  and any Interest Holder (the "*Indemnified Party*") who, by reason of his/her/its service on behalf of and with respect to the Company was, or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, for any damages or other costs and expenses incurred therefrom, unless the Company determines that such Indemnified Party has been made a party, or was threatened to be made a party, as a result of an act which was criminal, fraudulent or in bad faith, or as a result of gross negligence or an intentional breach of this Agreement.

(i)   Payment of Expenses in Advance of Final Disposition of Action.  If it is determined that an Indemnified Party is entitled to indemnification by the Company, expenses (including attorneys' fees) incurred in defending a civil, criminal, administrative or investigative action, suit or proceeding shall be paid by the Company in advance of the final disposition of that action, suit or proceeding.

(ii)   Non-Exclusive Right to Indemnity; Inures to Benefit of Heirs and Personal Representatives.  The rights of indemnification set forth in this Agreement are in addition to all rights to which the Indemnified Parties may be entitled as a matter of law, and shall continue as to a person who has ceased to be an Interest Holder, Managing Member or Member, and shall inure to the benefit of the successors, heirs and personal representatives of that Person.

(iii)   Insurance.  The Company may purchase and maintain insurance on behalf of any Indemnified Party, whether or not the Company would be required to indemnify that Person against that liability under the provisions of this Agreement.

## ARTICLE XIII
## APPRAISALS

Section 13.1    Experience.    Any Appraiser selected to determine the Appraised Value of the Company pursuant to this Agreement shall be experienced in the performance of the valuation of enterprises engaged in the telecommunications industry and shall hold the designation "CVA" or comparable designation.

Section 13.2    Selection of Appraiser.    An Appraiser shall be selected as follows:

(i)    The Members shall jointly select an Appraiser mutually agreeable to all of the Members. If the Members are unable to reach an agreement as to a mutually agreeable Appraiser the provisions of paragraph (i) below shall apply.

(ii)    If the Members cannot mutually agree upon selection of an Appraiser, as provided by paragraph (i) above, then each party shall, within forty (40) days of the date deliver to the other a list of three appraisers that are in the business of making valuations for entities such as or similar to the Company, and shall, within five (5) days thereafter, select one (1) appraiser from the list delivered by the other by written notice to the other. If either party fails to deliver a list of appraisers or to select an appraiser from such list, the other party may select an appraiser from its list and such appraiser shall serve as the sole appraiser. The two (2) appraisers selected by the parties shall, within twenty (20) days of their appointment, determine the Appraised Value of the Company. If the lower of the two (2) appraisals is at least eighty percent (80%) of the higher appraisal, then the fair market value shall be equal to the average of the two (2) appraisals. If the lower of the two (2) appraisals is less than eighty percent (80%) of the higher appraisal, then the two (2) appraisers shall, within five (5) days of the later of their reports, appoint a third appraiser (with qualifications similar to the two (2) appraisers) and such third appraiser shall, within twenty (20) days of his appointment, determine the Appraised Value of the Company.  In such event, the fair market value shall be equal to the average of all three (3) appraisals.

Section 13.3    Books & Records.    The Company shall be obligated to make all books and records of the Company available to the Appraiser during ordinary business hours and upon reasonable request.

Section 13.4    Final Determination.    The determination of the Appraiser of the Appraised Value of the Company, shall be final and conclusive.

## ARTICLE XIV
## MISCELLANEOUS

Section 14.1.    Notices.    A Notice is a writing containing the information required or permitted by this Agreement to be communicated to any Person.   Any Notice shall be delivered personally, by commercial carrier, by facsimile with a machine-generated confirmation sheet or mailed by United States mail, postage prepaid via registered, certified or regular mail, to the Company at its principal place of business and to the Interest Holders at their respective addresses or facsimile telephone numbers as set forth in **Schedule A** hereto, as amended from time to time (or at such other addresses or facsimile telephone numbers as a Interest Holder may have previously specified by Notice to the Company as the address or facsimile telephone number to which Notice shall be given to him).   Notice given personally or by commercial carrier is effective upon delivery.   Notice given by facsimile with a machine-generated confirmation sheet is effective upon sending.   Notice given by United States mail is effective the third delivery day after the date of mailing.   Any Interest Holder may change his/her/its address or facsimile telephone number to which Notices shall be sent by Notice to the Company in accordance with this

section.  Upon any such change of address or facsimile telephone number, the Company shall send written notice thereof to the other Interest Holders in accordance with this section.

Section 14.2.   <u>Entire Agreement</u>.  This Agreement contains a complete statement of all of the arrangements among the parties hereto with respect to the Company and cannot be changed or terminated orally or in any manner other than as provided in Article XI.

Section 14.3.   <u>No Presumption</u>.  This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement to be drafted.

Section 14.4.   <u>Severability of Provisions</u>.  If any provision of this Agreement, or the application thereof to any Person or circumstance, shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law.

Section 14.5.   <u>Governing Law; Venue</u>.  Irrespective of the place of execution or performance, this Agreement shall be governed by and construed in accordance with the laws of the State of Maryland, U.S.A., exclusive of any conflicts of laws principles.  This Agreement has been executed in the State of Maryland, U.S.A., and the parties hereto hereby agree to resolve any disputes arising hereunder in a court of competent jurisdiction located within the State of Maryland.  Each party agrees to submit to the personal jurisdiction of any such court, and further agrees that any judgment issued by any such court shall be fully enforceable in the courts or other judicial bodies of any other Jurisdiction.

Section 14.6.   <u>Captions</u>.  The captions, headings and titles in this Agreement are solely for convenience of reference and shall not affect its interpretation.

Section 14.7.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, and by different parties on different counterparts, each of which (taken together) shall be an original, but all of which shall constitute one instrument.

Section 14.8.   <u>Terminology</u>.  In this Agreement, all references made in the neuter, masculine or feminine gender shall be deemed to have been made in all such genders, and all references in the singular or plural number shall be deemed to have been made, respectively, in the plural or singular number as well.

Section 14.9.   <u>Binding Effect</u>.  This Agreement and all of the terms and provisions hereof will be binding upon and inure to the benefit of the Interest Holders and (to the extent provided herein) their respective heirs, executors, administrators, trustees, successors and permitted assigns.

**[Remainder of this page intentionally left blank.]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement under seal as of the day and year first above written.

WITNESS/ATTEST:                          **MEMBERS**:

                                         **Aramtel Limited**

                                         By: _____ (SEAL)
                                             Jay Salkini, Director

HAIDER THAMIR

                                         **DynaCorp Limited**

                                         By: _____ (SEAL)
                                             Dr. Faisal Fadul, Director

SHIBLIE O. SHIBLIE


**THE UNDERSIGNED EXECUTE THIS AGREEMENT FOR THE PURPOSE OF BEING BOUND BY SECTIONS 3.1 (INITIAL CAPITAL CONTRIBUTIONS; REPRESENTATIONS AND WARRANTIES), 3.10 (ADDITIONAL LICENSES), 4.6   (COMPETITIVE ACTIVITIES), ARTICLE IV (MANAGEMENT), AND SECTION 8.10 (OWNERSHIP OF DYNACORP).**

                                         **TECKTEL, LTD.**

                                         By: _____ (SEAL)
                                             Dr. Faisal Fadul

SHIBLIE O. SHIBLIE

                                         _____ (SEAL)
                                             Dr. Faisal Fadul


**THE UNDERSIGNED EXECUTE THIS AGREEMENT FOR THE PURPOSE OF BEING BOUND BY SECTIONS 3.8 (LOANS) AND 8.7(iii) (Determination of Cumulative Equipment Purchase Amount):**

WITNESS/ATTEST:                          **TECORE WIRELESS SYSTEMS MEA FZ-LLC**

                                         By: _____ (SEAL)
                                             Name/Title

**SCHEDULE A**
**TO**
**MOUTINY LIMITED**
**OPERATING AGREEMENT**

| Names and Addresses of Members | Initial Capital Contribution | Percentage of Interests |
| --- | --- | --- |
| Aramtel, Ltd.<br>P.O. Box 4703<br>Dubai, UAE | $500,000 | 50% |
| DynaCorp, Ltd.<br>1 Yonge Street, Suite 1801<br>Toronto, Ontario M5E 1W7<br>Canada | $500,000<br>(agreed value of 100% of<br>the ownership interests in<br>VitelTel) | 50 % |
| Total: | $1,000,000 | 100% |

**EXHIBIT 1**
**TO**
**MOUTINY LIMITED**
**OPERATING AGREEMENT**


**MEMORANDUM OF ASSOCIATION**
**OF**
**MOUTINY LIMITED**

**EXHIBIT 2**

**LOAN PROMISSORY NOTE**

$30,000,000                                                                                                  April 12, 2006

**FOR VALUE RECEIVED, MOUTINY LIMITED**, a United Arab Emirates limited company and **VITELTEL**, an Iraq public limited company (collectively, the "***Borrower***"), jointly and severally promise to pay to the order of **ARAMTEL LIMITED**, a United Arab Emirates limited company, or its successors or assigns (the "***Lender***"), the principal amount of THIRTY MILLION DOLLARS ($30,000,000) or such lesser amounts as shall equal the outstanding balance (as shown on **Schedule A** attached hereto) (the "***Principal Amount***") of loans made by the Lender to the Borrower, plus interest as provided herein on the unpaid balance thereof.  The outstanding Principal Amount shall be due and payable on January 1, 2013.  Interest on the outstanding Principal Amount shall be due and payable on the first day of each calendar quarter beginning on January 1, 2008, and ending on January 1, 2013.

**Manner of Funding**.  Borrower acknowledges and agrees that Principal Amounts represented by this Note have been advanced by Lender on behalf of Borrower in order to satisfy Borrower's obligation to purchase certain telecommunications equipment from TECORE Wireless Systems MEA FZ-LLC and approved operating expenses, pursuant to express authority granted to Lender by Borrower.

**Payments; Late Charge**.  All payments on account of this Note, when paid, shall be applied first to the payment of all interest then due on the unpaid balance of the Principal Amount and the balance, if any, shall be applied in reduction of the unpaid balance of the Principal Amount.  All payments of the unpaid balance of the Principal Amount and interest thereon shall be paid in lawful money of the United States of America during regular business hours at the office of the Lender or at such other place as the Lender or any other holder of this Note may at any time or from time to time designate in writing to the Borrower.  If the Borrower fails to make any payments as and when due and payable of any principal of or interest on the Note, and such payment is not made within five (5) days after written notice thereof to the Borrower, the Borrower shall pay to the Lender on demand a late charge equal to five percent (5%) of the amount of any such payment.

**Interest**.  Interest shall accrue at a per annum rate equal to twelve percent (12%) on the unpaid balance of the Principal Amount of this Note.  Interest shall be computed on the basis of a 365-day year and the actual number of days elapsed.  After the maturity of this Note (whether by acceleration, declaration, extension, or otherwise), the Borrower promises to pay to the Lender upon demand interest on the unpaid balance of the Principal Amount from the date of such maturity until the Principal Amount together with all accrued and unpaid interest has been paid at a rate equal to the rate of interest otherwise payable on this Note plus five percent (5%) per annum.

**Prepayments**.  The Borrower may prepay the unpaid balance of the Principal Amount only to the extent of cash flow from the operations or capital transactions of the Borrower (excluding cash flow from capital contributions or borrowing).  Such prepayment shall be without premium or

penalty; <u>provided</u>, that any such prepayment is accompanied by interest accrued and unpaid on the amount so prepaid to the date of such prepayment.

**Recording of Loans**.  Borrower hereby authorizes Lender to record on **Schedule A** of this Note the date and amount of each of the loans made by the Lender to Borrower this Note and each prepayment of such loans (but agrees that the failure of Lender to do so shall not affect the obligations of Borrower to Lender in respect of such loans).

**Event of Default**.  The occurrence of any one or more of the following events (each an "***Event of Default***") shall constitute a default under this Note: (a) failure of the Borrower to pay within five (5) days of its due date any principal, interest, principal and interest, or any other fees or charges due hereunder; (b) the failure of the Borrower to generally pay its debts as they become due; (c) the filing of any petition for relief under the Bankruptcy Code or any similar federal or state insolvency statute by or against the Borrower and such petition is not dismissed within sixty (60) days; (d) an application or petition for the appointment of a receiver or custodian for, the making of a general assignment for the benefit of creditors by, or the insolvency of, the Borrower; (e) the Borrower breaches, terminates or otherwise forfeits any of the Borrower's rights under that certain WLL O&M Agreement by and between the Iraqi Telecommunications and Posts Company and VitelTel, dated November 27, 2005 or any other license, permit, or manner of rights to provide wireless telecommunications services; or (f) the occurrence of an event (or series of events) that causes, or will cause with the passage of time, a material adverse effect in the financial condition or operation of the business of the Borrower, as determined by the Lender.  Upon the occurrence of an Event of Default hereunder, the Lender may, in the Lender's sole and absolute discretion, declare the entire unpaid balance of principal plus accrued interest and any other sums due hereunder immediately due and payable.  Failure to exercise this option, however, shall not constitute any waiver of a right to exercise the same in the event of a subsequent default.

**Remedies**.  After maturity of this Note (whether by acceleration, declaration, extension, or otherwise), the Borrower hereby authorizes any attorney designated by the Lender or any clerk of any court of record to appear for the Borrower in any court of record and confess judgment against the Borrower without prior hearing, in favor of the Lender for and in the amount of the unpaid balance of the Principal Amount then outstanding, plus any late fees accrued and unpaid thereon, plus interest and accrued and unpaid thereon, together with any costs of suit and attorneys' fees.  If this Note is forwarded to an attorney for collection after maturity hereof (whether by acceleration, declaration, extension, or otherwise), the Borrower shall pay all reasonable costs and expenses of collection including attorneys' fees of fifteen percent (15%) of the unpaid balance of the Principal Amount then outstanding.  The Borrower hereby waives (a) presentment or demand for payment of this Note, (b) notice of dishonor of this Note, (c) protest of dishonor of this Note, and (d) notice of nonpayment of this Note.  The rights and remedies of the Lender hereunder shall be cumulative and concurrent and may be pursued singularly, successively, or together at the sole discretion of the Lender and may be exercised as often as occasion therefor shall occur, and the failure to exercise any such right or remedy shall in no event be construed as a waiver or release of the same or any other right or remedy.  The payments due under this Note shall not be subject to any counterclaim, recoupment, set-off, reduction, or defense based upon any claim that the Borrower may have against the Lender.

**Binding Nature**.  This Note shall inure to the benefit of and be enforceable by the Lender and the Lender's successors and assigns, and shall be binding and enforceable against the Borrower and the Borrower's successors.

**Severability**.  If any provision or part of any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note and this Note shall be construed as if such invalid, illegal or unenforceable provision or part hereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

**Governing Law**.  This Note shall be governed and construed under the laws of the State of Maryland, U.S.A. without regard to any conflicts of laws rules.

**IN WITNESS WHEREOF**, each of the Borrowers has caused this Note to be executed in its name, under its seal, and on its behalf the day and year first written above.

**WITNESS/ATTEST:**

HAIDER THAMIR

SHIBLIE O. SHIBLIE

**MOUTINY LIMITED**

By: _____ (SEAL)
Dr. Faisal Fadul, Chief Executive Officer

**VITELTEL**

By: _____ (SEAL)
Dr. Faisal Fadul

## EXHIBIT 3

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** is made this 12 day of March 2006, by and between **ARAMTEL LIMITED**, a United Arab Emirates limited liability company, (the "***Secured Party***") and **MOUTINY LIMITED**, a United Arab Emirates limited liability company and **VITELTEL**, an Iraq public limited company (each a "***Debtor***" and collectively, the "***Debtors***").

**WHEREAS**, the Secured Party has loaned to the Debtors Thirty Million Dollars ($30,000,000) (the "***Loan***"), which loan is evidenced by that certain Promissory Note (the "***Note***") in favor of the Secured Party of even date herewith; and

**WHEREAS**, the Secured Party has required as a condition to making the Loan that each of the Debtors assign and pledge all of its right, title, and interest in and to the "Collateral" described below.

**NOW, THEREFORE**, in consideration of the premises and in order to induce the Secured Party to make the Loan, each of the Debtors hereby covenants for the benefit of the Secured Party as follows:

1.      **Grant of Security Interest**. Each of the Debtors hereby grants to the Secured Party a security interest in and to: (i) all of the Debtor's rights, benefits, and entitlements under that certain WLL O&M Agreement by and between the Iraqi Telecommunications and Posts Company and VitelTel, dated November 27, 2005 (the "***License***"); (ii) any other license, permit, or manner of right of the Debtor to provide wireless telecommunications services anywhere in the world; (iii) all of the Debtor's equipment (including all telecommunications equipment and motor vehicles), tools, furniture, furnishings, fixtures, and machinery, both now owned and hereafter acquired, together with all additions, parts, fittings, accessories, special tools, attachments, and accessions now and hereafter affixed thereto and/or used in connection therewith (collectively, the "***Tangible Personal Property***"); (iv) all records relating or pertaining to any of the foregoing (the "***Records***"); and (v) any substitutes for and any proceeds of any of the foregoing, including insurance proceeds thereof (all of the foregoing being hereinafter referred to as the "***Collateral***").

2.      **The Debts**. The security interest hereby granted is to secure the payment by the Debtors of the Note, from the Debtors to the Secured Party, including, without limitation, principal, interest, late payment charges, and costs of collection. Such obligations are hereinafter referred to as the "***Debts***".

3.      **Covenants of the Debtor**. Each of the Debtors covenants and agrees as follows:

a.      The Debtor shall not encumber or suffer the encumbrance of the Collateral and shall defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

b.      The Tangible Personal Property and Records shall be kept at the Debtor's principal office and shall not be moved to any other location without at least thirty (30) days prior written notice to the Secured Party.

c.      The Debtor will faithfully and diligently keep and perform all of its obligations, duties, and responsibilities under the terms of the License, and under the terms of all of the other licenses, contracts, and instruments constituting the Collateral, so as to preserve and protect the value thereof and the enforceability of the Debtor's rights thereunder.

d.      The Debtor shall immediately notify the Secured Party in writing of any event causing loss or significant depreciation in the value of the Collateral, any event which might impair the ability of the Debtor or of the Secured Party to dispose of the Collateral, and any event which might impair the rights and remedies of the Secured Party in relation thereto, including, but not limited to, the levy of any order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

e.      The Debtor shall keep the Tangible Personal Property in good condition and repair, and will not waste or destroy the Tangible Personal Property, ordinary wear and tear excepted.

f.      The Debtor shall have and maintain insurance at all times with respect to the Tangible Personal Property, in such amounts and with such companies as are reasonably satisfactory to the Secured Party, insuring against risks of fire (including extended coverage), theft, and damage.  Such insurance shall be payable to the Debtor and the Secured Party, as their interests may appear, and shall not be cancelable without first providing thirty (30) days' written notice to the Secured Party. The Debtor shall promptly deliver to the Secured Party, upon request, certificates or other evidence satisfactory to the Secured Party of the maintenance of such insurance. To the extent of any payments remaining under the Note, the Debtor hereby assigns to the Secured Party proceeds of such policies, and authorizes and empowers the Secured Party to collect such sums and to execute and endorse in the Debtor's name all proofs of loss, drafts, checks, and other documents necessary to accomplish such collections, and any persons or entities making payments to the Secured Party under the terms of this paragraph are hereby relieved absolutely from any obligation to see to the application of any sums so paid.

g.      The Debtor shall promptly pay when due all taxes and assessments upon the Collateral, if any, levied for the period after the date hereof.

h.      The Debtor shall do, make, execute, and deliver all such additional further acts, things, deeds, assurances, and instruments as the Secured Party reasonably may require, to assure the Secured Party that its rights hereunder in or to the Collateral have been perfected, and Debtor will pay all costs, expenses, taxes, charges, and fees in connection therewith.

4.      **Events of Default**.  The following shall constitute events of default hereunder:

a.      The failure of the Debtors to pay any of the Debts when and as due under the Note, unless such failure is waived in writing by the Secured Party.

b.      The failure of either of the Debtors to comply with any of the terms and provisions of this Agreement or the failure of either of the Debtors to perform, observe or comply with any other agreement between the Debtors and the Secured Party.

c.      The loss, termination, breach, sale, assignment, transfer, encumbrance, or other forfeiture of either of the Debtor's rights to or of any material portion of the Collateral, or the making of any levy, seizure or attachment thereof or thereon.

d.      The insolvency, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors of, or the commencement of any proceedings, including an arrangement or reorganization, under any bankruptcy or insolvency law by or against either of the Debtors.

5.      **Remedies Upon Default**.  Upon the occurrence of any such event of default, and at any time thereafter, the Secured Party shall have all of the rights and remedies of a secured party under the Uniform Commercial Code, or any corresponding law of any other state, nation or jurisdiction, including the right to sell the Collateral at public sale without the necessity of first obtaining a judicial decree authorizing sale.

Such remedies shall be in addition to any other remedies provided by law or in any other document executed by either of the Debtors. Additionally, the Secured Party shall have the right to demand and directly collect the Collateral or any proceeds of the Collateral and otherwise deal with the Collateral in all respects necessary to permit the Secured Party to realize upon the security hereby granted. In connection therewith, each of the Debtors irrevocably authorizes any nominee of the Secured Party, as attorney-in-fact for the Debtor, to endorse or sign the Debtor's name on all collections, receipts or other documents.

6.     **Future Advances**.  The security interest granted by the Debtors shall secure all current and future advances made by the Secured Party to either of the Debtors under the Note and otherwise, and the Secured Party may advance or re-advance upon repayment by either of the Debtors all or any portion of the Loan and any such advancement or re-advancement shall be fully secured by the security interest created by this Agreement.

7.     **Tangible Personal Property not Fixtures**.  The Debtors warrant that all Tangible Personal Property which constitutes a part of the Collateral is personalty and is not and will not be affixed to real estate in such manner as to become a fixture or part of such real estate. If, in the opinion of the Secured Party, any such Tangible Personal Property is or may become part of any real estate, the Debtors will furnish to the Secured Party a written waiver by the record owner of such real estate of all interest in such Tangible Personal Property and a written subordination to the Secured Party's security interest and lien by any person who has a lien on or security interest in such real estate which is or may be superior to the Secured Party's security interest hereunder.

8.     **Waiver**.  The Secured Party shall not be deemed to have waived any of its rights hereunder unless such waiver is in writing and signed by the Secured Party. No delay or omission on the part of the Secured Party in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.

9.     **Termination**.  This Agreement shall terminate upon the full payment of the Debts.

10.    **Governing Law**.  This Agreement shall be deemed to have been made in Maryland and shall be governed by and construed in accordance with the laws of Maryland without regard to any conflict of laws provisions.

11.    **Binding Effect**.  This Agreement shall be binding upon the parties hereto and upon their respective successors and assigns.

**[Remainder of this page intentionally left blank.]**

**IN WITNESS WHEREOF,** the parties have executed this Security Agreement, under seal, by their respective duly authorized agents, as of the day and year first above written.

**WITNESS/ATTEST:**

HAIDER THAMIR

SHIBLIE O. SHIBLIE

SHIBLIE O. SHIBLIE

**MOUTINY LIMITED**

By: _____ (SEAL)
Dr. Faisal Fadul, Chief Executive Officer

**ARAMTEL LIMITED**

By _____ (SEAL)

**VITELTEL**

By: _____ (SEAL)

**EXHIBIT 5**

**INTEREST TRANSFER PROMISSORY NOTE**

$_____                                        _____ ___, 20__

                                                   _____, _____

     FOR VALUE RECEIVED, on or before _____, 20__, the undersigned, _____, a _____ resident (the "Maker"), promises to pay to the order of _____ (the "Payee"), the principal sum of _____ ($_____) (the "Principal Amount"). Additionally, the Maker promises to pay to the order of the Payee interest on the unpaid balance of the Principal Amount from the date hereof until the maturity of this Note (whether by acceleration, declaration, extension, or otherwise) at the rate of _____ (__%) per annum. Interest accrued on the unpaid balance of the Principal Amount from the date hereof until the maturity of this Note (whether by acceleration, declaration, extension, or otherwise) during each year or portion thereof shall be paid by the Maker to the Payees on _____ of _____ in each year, commencing with the first such date following the date of this Note and on the same day of each _____ thereafter until the maturity of this Note (whether by acceleration, declaration, extension, or otherwise).

     **In the event Maker shall fail to make any payment within Ten (10) days after its due date, Maker shall pay a late charge of Five Percent (5%) of the amount not paid in a timely manner, without written notice or additional demand therefor.**

     **All payments required under the terms of the Note shall be paid in lawful money of the United States of America at such place as the holder of this Note shall designate to Maker in writing at any time or from time to time.**

     Maker may prepay the principal amount outstanding, in full or in part, at any time, without premium or penalty. Any such prepayment shall be applied, first, to the principal amount outstanding hereunder, then to any accrued interest and all other payments made pursuant to the Note shall be applied first to any late fees and penalties, to any accrued interest and then to the principal amount outstanding hereunder.

     If this Note rightfully is forwarded to an attorney for collection, Maker shall pay on demand all costs and expenses of collection, including a reasonable fee for attorneys not to exceed Fifteen Percent (15%) of the then outstanding principal balance hereunder.

     The failure of Maker to pay any payment hereunder within thirty (30) days after the due date thereof, which failure shall remain uncured for ten (10) days after Payee's written notice to Maker thereof, shall constitute a default (an "Event of Default"). If an Event of Default shall occur, the holder of this Note may declare the entire unpaid principal balance of this Note, and any unpaid late charges imposed thereon, immediately due and payable.

     The rights and remedies set forth in this Note may be exercised by the holder of this Note during any default by the Maker, regardless of any prior forbearance, and are in addition to any other rights or remedies provided by law or in equity.

     The Maker hereby waives presentment for payment, demand for payment, protest, notice of protest and of dishonor, and any and all demands and notices that might otherwise be required by law.

This Note shall be deemed to be made in, and shall be governed by the laws of _____.

IN WITNESS WHEREOF, the Maker has signed and sealed this Promissory Note as [his/her/its] act and deed.

WITNESS/ATTEST:

_____          _____(SEAL)
                                            _____

**EXHIBIT 6**

**MOUTINY BUSINESS PLAN**

1673836v2